**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BRAINBUILDERS, LLC, *on assignment of MRS. E.; on behalf of herself and on behalf of her minor child, Y.*,<br><br>Plaintiff,<br><br>v.<br><br>OCEAN HEALTHCARE MANAGEMENT GROUP BENEFIT PLAN and OCEAN HEALTHCARE MANAGEMENT LLC,<br><br>Defendants. | Civil Action No. 3:20-cv-2495 (GC) (TJB)<br><br>**MEMORANDUM OPINION** |

CASTNER, District Judge

**THIS MATTER** comes before the Court upon the parties' cross-motions for summary judgment in connection with their dispute arising from divergent interpretations of the Ocean Healthcare Management Group Benefit Plan, the operative employee benefits plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* The parties' cross-motions are limited to the issue of the reimbursement rate for certain services rendered by Plaintiff Brainbuilders, LLC (an out-of-network provider of autism-related behavioral services) to patient Y., the minor child of Mrs. E. (at all relevant times an employee of Ocean Healthcare Management LLC) between July 1, 2018, through September 27, 2019.

The Court has carefully considered the parties' submissions, and decides the matter without oral argument pursuant to Federal Rule of Civil Procedure ("Rule") 78 and Local Civil Rule 78.1. For the reasons set forth herein, Defendants Ocean Healthcare Management Group Benefit Plan

and Ocean Healthcare Management Group's Motion for Summary Judgment (*see* ECF No. 35) is **DENIED,** and Brainbuilders, LLC's Cross-Motion for Summary Judgment (*see* ECF No. 39) is also **DENIED**. The Court **REMANDS** for the administrator of the Ocean Healthcare Management Group Benefit Plan to clarify within forty-five (45) days the basis for its rate of reimbursement for the covered services Plaintiff rendered between July 1, 2018, through September 27, 2019, during which time the Centers for Medicare and Medicaid Services ("CMS") did not have published rates (*see* CPT[1] codes H0031, H0032, H2019, H2012, and H2014).

## I.    BACKGROUND[2]

### A.    Procedural History

On January 31, 2020, Plaintiff Brainbuilders, LLC ("Plaintiff") initiated this action in the Superior Court of New Jersey, Law Division, Docket No. OCN-L-000331-20, by assignment of the rights of Mrs. E., an employee of Ocean Healthcare Management LLC ("Ocean Healthcare"), whose minor child, patient Y., received autism related services from Plaintiff. (*See* ECF No. 1, Ex. A.)  On or about March 6, 2020, Defendants Ocean Healthcare and the Ocean Healthcare Management Group Benefit Plan (the "Plan") (collectively, "Defendants") removed this action to this Court on the basis of federal question jurisdiction pursuant to 28 U.S.C. § 1331.  (*See* ECF No. 1.)

---

[1]    "CPT" refers to the Current Procedures Terminology, which is a system for coding medical services and procedures.

[2]    On a motion for summary judgment, the Court "draw[s] all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party." *Jaffal v. Dir. Newark New Jersey Field Off. Immigr. & Customs Enf't*, 23 F.4th 275, 281 (3d Cir. 2022) (quoting *Bryan v. United States*, 913 F.3d 356, 361 n.10 (3d Cir. 2019)).

The underlying Complaint brings two claims pursuant to ERISA, the landmark statute governing employee benefit plans, as well as three common law claims.[3]  Specifically, the first two claims arise under ERISA's Section 502(a)(1)(B).[4]  (*See* ECF No. 1, Ex. A ¶¶ 40-48.)  The first claim seeks a declaratory judgment per provision 502(a), *see* 29 U.S.C. § 1132(a)(1)(B).  (*Id.* ¶¶ 40-44.)  The second cause of action—and the lone cause implicated by the instant cross-motions— seeks to recover benefits and/or enforce the relevant rights under the terms of the Plan, and in accord with Section 502(a)(1)(B), *see* 29 U.S.C. § 1132(a)(1)(B).  (*See* ECF No.1, Ex. A ¶¶ 45-48.)  In short, Plaintiff alleges that it "is entitled to reimbursements of at least 50% of Brainbuilders' billed amount for the services that were provided by Brainbuilders from June of 2018 up to the present, and into the future, as long as necessary, provided that Y. remains a qualified dependent." (*Id.* ¶ 47.)

In March 2021, the Court ruled on a dispute between the parties as to whether discovery would be limited to the record.  (*See* ECF No. 20.)  Plaintiff had sought an order compelling Defendants to produce "all documents that were used, or should have been used, in the process of administration" of its claim for services.  (*Id.* at 6.[5])  In denying Plaintiff's motion, the Court held that in the absence of allegations of a conflict of interest, bias, or inconsistent decisions by the Plan, "discovery should be limited to the administrative record." (*Id.* at 12.)

---

[3]      The three common law claims include: intentional interference in an economic relationship (*see* ECF No. 1, Ex. A ¶¶ 49-51); civil conspiracy (*id.* ¶¶ 52-54); and civil aiding and abetting (*id.* ¶¶ 55-56).

[4]      Section 502 enables participants and beneficiaries to bring civil actions under the ERISA statute.  *See* 29 U.S.C. § 1132.

[5]      Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

After the parties invested significant effort trying to settle the matter, Defendants requested leave in April 2022 to move for summary judgment on the limited issue at bar, "[s]ince the appropriate rate of reimbursement is the primary point of contention between the parties and the primary impediment to advancing settlement discussions" (*see* ECF No. 33 at 1), which the Court granted (*see* ECF No. 34).  On June 10, 2022, Defendants timely moved for summary judgment, asking the Court to enter an order holding that for certain services Plaintiff rendered between July 1, 2018, through September 27, 2019, during which time CMS did not have published rates (*see* CPT codes H0031, H0032, H2019, H2012, and H2014), "the appropriate rate of reimbursement is gap methodology as set forth in the pertinent plan documents."  (*See* ECF No. 35-4.)  In response, Plaintiff cross-moved, asking the Court to enter an order holding that for the same services the appropriate rate of reimbursement is "50% of the amounts billed by Brainbuilders LLC."[6]  (*See* ECF No. 39-5.)

Defendants submitted their reply (*see* ECF No. 40), and Plaintiff filed its sur-reply with the Court's permission (*see* ECF No. 44).

### B.    Facts Undisputed, or Substantiated by Record Evidence[7]

Plaintiff Brainbuilders is an out-of-network ("OON") provider of services to children with autism spectrum related disorders.  (SMF & RSMF ¶ 2.)  In or around September 2016, Plaintiff

---

[6]    Defendants take issue with Plaintiff filing a cross-motion without first obtaining leave of the Court (*see* ECF No. 40 at 7); however, seeing as the cross-motion is limited to the same question raised by Defendants' motion, the Court would have permitted leave had it been sought and does not find it to have been improperly filed under the circumstances.

[7]    Defendants' Rule 56.1 Statement of Material Facts ("SMF") is at ECF No. 35-2; Plaintiff's Responsive Statement of Material Facts ("RSMF") is at ECF No. 39-2; Plaintiff's Cross-Statement of Material Facts ("XSMF") is at ECF No. 39-1; and Defendants' Response to Plaintiff's Cross-Statement of Material Facts ("XRSMF") is at ECF No. 40-2.

began providing Applied Behavioral Analysis ("ABA") therapy services to patient Y., the minor child of Mrs. E. (SMF & RSMF ¶¶ 14-15.)

At that time and through the initiation of this action, Mrs. E was an employee of Ocean Healthcare and a participant in the Plan. (SMF & RSMF ¶ 13.) The Plan[8] is a discrete legal entity governed by ERISA's employee benefit provisions, and it is charged with "provid[ing] comprehensive health and welfare benefits to its participants" in accord with its terms. (SMF & RSMF ¶¶ 3-4.) By its terms, the Plan promises to reimburse benefits "for services and supplies for covered expenses that are medically necessary" only up to the stated maximum level. (SMF & RSMF ¶ 6.) Ocean Healthcare acts as the administrator for the Plan. (SMF & RSMF ¶ 3.)

Notably, the Plan confers upon Ocean Healthcare, as the administrator, the "authority and responsibility to determine all factual and legal questions under the Plan as well as the discretionary authority to grant or deny benefits under the Plan." (SMF & RSMF ¶ 11.) To facilitate the provision of administrative and other services relating to claims, the Plan utilizes the services of third-party entity United Medical Resources, Inc. ("UMR"). (SMF & RSMF ¶ 5; *see also* ECF No. 35-3 at 39 ("The Plan Administrator has retained the services of Independent Third-Party Administrators to process claims and handle other duties for this self-funded Plan," including UMR "for medical claims."); *accord id.* at 166.)

---

[8]     The Plan's governing document, the Ocean Healthcare Management Group Benefit Plan's Summary Plan Description, "summarizes the benefits and limitations of the Plan and [] serve[s] as the [Summary Plan Description ('SPD')] and Plan document." (*See* ECF No. 35-3, Ex. 3.) Accordingly, the Court will conform to the document's statement that "it will be referred to as both the [SPD] and the Plan document" (*see id.*), and will hereinafter reference the document interchangeably as the SPD and Plan document. The parties are in agreement that Defendants provides an authentic copy of the 2018 Plan document (*see* ECF No. 39-3 ¶ 3). Additionally, the parties agree on the authenticity of the 2019 Plan document (*see* ECF No. 35-3, Ex. 4; ECF No. 39-3 ¶ 3), of the Amended Appeal Determination, dated December 23, 2021 (*see* ECF No. 35-3, Ex. 5; ECF No. 39-3 ¶ 3), and of the Initial Appeal Determination, dated November 27, 2019 (*see* ECF No. 35-3, Ex. 7; ECF No. 39-3 ¶ 3).

If a participant's claim for OON services is denied in whole or in part, the participant should receive a denial notice that provides, among other things, the reason for the denial, specific references to the Plan provisions upon which the denial is based, and steps that can be taken to appeal. (SMF & RSMF ¶ 9.)  A participant can then request review of the denial by submitting an appeal as set forth in the Plan. (SMF & RSMF ¶ 10.)

Prior to July 2018, Plaintiff's out-of-network services provided to Y. were reimbursed by the Plan at a rate of at least fifty percent of billed charges for appropriate services. (SMF & RSMF ¶ 16.)  From July 1, 2018, through September 27, 2019, Plaintiff submitted claims to the Plan for services that form the basis of the instant motion practice:  CPT codes H0031, H0032, H2019, H2012, H2014, and 97530. (SMF & RSMF ¶ 18.)  There was no rate then-published by CMS, which is part of the United States Department of Health and Human Services, for any of the CPT codes other than 97530. (SMF & RSMF ¶ 19.)

According to the terms of the 2018 Plan, which covered OON services from February 1, 2018 through January 31, 2019:

> **Usual and Customary (U&C) (Applies to Benefit Plan(s) 001, 002)** – reimbursement for Covered Expenses received from providers, including Physicians or health care facilities, who are not part of Your Network are determined based on one of the following:
>
> - Fee(s) that are negotiated with the Physician or facility; or
> - The amount that is usually charged by health care providers in the same geographical area (or greater area, if necessary) for the same services, treatment, or materials:
>   - ➢ 140 percent of the published rates allowed by the Centers for Medicare and Medicaid Services (CMS) for the same or similar service within the geographic market; or
>   - ➢ A gap methodology may be utilized when CMS does not have rates published for certain procedural codes; or
>   - ➢ 50 percent of the provider's billed charges when unable to obtain a rate published by CMS and/or gap methodology does not apply.

6

[(ECF No. 35-3 at 135; SMF & RSMF ¶ 7.)]

The 2019 Plan, which covered OON services from February 1, 2019, through January 31, 2020, similarly stated:

> **Usual and Customary (U&C) (Applies to Benefit Plan(s) 001, 002)** – reimbursement for Covered Expenses received from providers, including Physicians or health care facilities, who are not part of Your Network are determined based on one of the following:
>
> - Fee(s) that are negotiated with the Physician or facility; or
> - The amount that is usually charged by health care providers in the same geographical area (or greater area, if necessary) for the same services, treatment, or materials:
>   - ➢ 110 percent of the published rates allowed by the Centers for Medicare and Medicaid Services (CMS) for the same or similar service within the geographic market; or
>   - ➢ A gap methodology may be utilized when CMS does not have rates published for certain procedural codes; or
>   - ➢ 50 percent of the provider's billed charges when unable to obtain a rate published by CMS and/or gap methodology does not apply.

[(ECF No. 35-3 at 263; SMF & RSMF ¶ 8.)]

Thus, according to the 2018 and 2019 Plans, when an OON provider sought reimbursement for covered services for which there was no negotiated fee and no published rates from CMS, the Plan administrator could utilize a "gap methodology" and, when the gap methodology did not apply, the Plan was expected to reimburse the OON provider at fifty percent of the provider's billed charges. (ECF No. 35-3 at 135, 263.)

On or about September 6, 2019, Plaintiff submitted a claims appeal to UMR related to the already-identified services[9] provided from July 1, 2018, onward for which there were no published CMS rates. (ECF No. 35-3 at 307; SMF & RSMF ¶ 24.) Plaintiff wrote that "these claims and authorizations were previously submitted and denied in part or in whole. The request for rationale

---

[9]     (*See* CPT codes H0031, H0032, H2019, H2012, and H2014.)

and documentation . . . went unanswered, and requested documents were not supplied . . . . Further an actual denial of authorization on paper with rational[e] was never sent to us, even though we requested it multiple times.  We are therefore appealing with the limited information that we have . . . ." (ECF No. 35-3 at 307.)  UMR wrote back to state that a review of Plaintiff's appeal was being conducted.  (SMF & RSMF ¶ 25.)

Three weeks later, on or about November 27, 2019, UMR provided a response to Plaintiff's appeal.  (ECF No. 35-3 at 315; SMF & RSMF ¶ 26.)  The response stated that the adverse benefit determination was partially upheld following a review of Plaintiff's appeal, medical records, and the provisions of the Plan.  (ECF No. 35-3 at 315-22; SMF & RSMF ¶ 27.)  It stated that "[t]he plan allowance is 140% of the Medicare allowance" and proceeded to provide a breakdown of the dates of service, CPT code, billed amount, and reimbursement amount.[10]  (ECF No. 35-3 at 316.)  Nowhere did UMR's response state that a gap methodology was used in determining the reimbursement amount for any billed services or how the reimbursement amount was calculated for each billed service.  (*Id.* at 315-322.)  Nevertheless, the response attached what appears to be standard notices that contained the same language from the 2018 Plan indicating that "[a] gap methodology may be utilized when CMS does not have rates published for certain procedural codes." (*Id.* at 325.)

Plaintiff proceeded to file its Complaint in the Superior Court of New Jersey on January 31, 2020.  (*See* ECF No. 1, Ex. A.)  Almost a year later, on or about December 23, 2021, UMR amended its response to Plaintiff's appeal.  (*See* ECF No. 35-3 at 291; SMF & RSMF ¶ 26.)  After again stating that the adverse benefit determination was partially upheld and "[t]he plan allowance

---

[10]     For example, it stated that on July 2, 2018, Plaintiff billed for CPT code H2019 in the amount of $2,340.00 and that the reimbursement amount was $297.86.  (ECF No. 35-3 at 317.)

is 140% of the Medicare allowance," the response now inserted a sentence that states: "A gap methodology may be utilized when the Centers for Medicare and Medicaid Services does not have rates published for certain procedural codes." (ECF No. 35-3 at 293.) UMR's amended December 23, 2021 determination did not clarify if a gap methodology was in fact utilized and, in the event it was, what the gap methodology would be. However, the rates of reimbursement detailed in UMR's December 23, 2021 amended determination are identical to the rates of reimbursement in the initial November 27, 2019 response. (XSMF & XRSMF ¶ 33; *compare* ECF No. 35-3 at 317-22, *with id.* at 293-98.)

### C.    Parties' Arguments

Defendants' motion argues that the Plan administrator's determinations as to the rates of reimbursement for the services in dispute was not arbitrary and capricious. (ECF No. 35-1 at 12.) They contend that the administrator's interpretation of the Plan to permit application of a gap methodology for determining the rate of payment for services for which there were no CMS published rates "was reasonable and consistent" with the plain terms of the Plan. (*Id.* at 15-16.) They submit that district courts regularly dismiss ERISA complaints "claiming 'underpayments' where the Plan does not support that assertion," and that Plaintiff's request for reimbursement at fifty percent of its billed rate is not supported by the Plan. (*Id.* at 18-20.)

Plaintiff's cross-motion argues that "no one disputes the Plan's right to apply a legitimate 'gap methodology,'" but that Defendants' belated "assertion of 'gap methodology' is unintelligible and lacks credibility." (ECF No. 39-4 at 4-5.) Plaintiff points out that at no point during the administrative appeals process did Defendants ever state that a gap methodology was in fact utilized, and "the only hint . . . was the December 23, 2021 revision of the appeal response, in which they inserted that a gap methodology 'may be utilized.'" (*Id.* at 6.) Even then, Plaintiff

complains that Defendants want the Court to accept that such a methodology was not arbitrary and capricious "without any explanation or evidence." (*Id.*) Plaintiff submits that the administrator's actions are both procedurally and substantively arbitrary and capricious and that the challenged "rate determinations are unsupported by substantial evidence and are not rational in light of the plan's provisions."[11]   (*Id.* at 9.)   In reply, Defendants argue that to the extent Plaintiff seeks disclosure of the gap methodology utilized, there is "no authority to support the production of such data, and such a request is counter to the weight of persuasive authority." (ECF No. 40 at 17.)

## II.   LEGAL STANDARD

### A.   Federal Rule of Civil Procedure 56: Summary Judgment

Pursuant to Rule 56, "[s]ummary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party and drawing all inferences in favor of that party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.,* 835 F.3d 388, 402 (3d Cir. 2016) (citing Fed. R. Civ. P. 56(a)).   "A fact is material if—taken as true—it would affect the outcome of the case under governing law." *M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   "And a

---

[11]   Plaintiff has submitted documentation related to what it believes a third-party administrator, Fair Health, Inc., determines is usual and customary for health care professionals in the relevant geographic area, arguing that it shows that what Defendants sought to pay is far below the industry standard. (*See* ECF No. 39-3, Exs. A-D; ECF No. 39-4 at 12.)   Because the Court's review of the Plan administrator's decision is largely limited to the content of the administrative record, it has not relied on this documentation in reaching its decision.

factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.*

The standard is the same in the context of cross-motions for summary judgment. *Auto-Owners Ins.*, 835 F.3d at 402. "When both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Id.* (citing 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2720 (3d ed. 2016)).

### B.    ERISA, Section 502(a)(1)(B)

"Section 502(a)(1)(B) of ERISA creates a civil cause of action for a plan participant 'to recover benefits due to him[/her] under the terms of his[/her] plan, to enforce his[/her] rights under the terms of the plan, or to clarify his[/her] rights to future benefits under the terms of the plan.'"[12] *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120 (3d Cir. 2012) (quoting 29 U.S.C. § 502(a)(1)(B)). "To assert a claim under this provision, a plan participant must demonstrate that 'he or she . . . ha[s] a right to benefits that is legally enforceable against the plan,' and that the plan administrator improperly denied those benefits." *Id.* (quoting *Hooven v. Exxon Mobil Corp.*, 465 F.3d 566, 574 (3d Cir. 2006)).

---

[12]    Under Section 502(a), only participants and beneficiaries of the Plan have standing to vindicate their rights as enumerated in the Plan via ERISA's civil enforcement mechanism. *See* 29 U.S.C. § 1132(a)(1)(B). Here, however, Plaintiff has indicated that it was assigned Mrs. E's rights, and Defendants do not contest Plaintiff's derivative provider standing. (ECF No. 35-1 at 17 n.10 ("Although derivative standing is foreclosed if the plan in question contains an unambiguous anti-assignment provision, the Plan document in this case contains no such provision.").)

As here,[13] "[w]hen a plan grants its administrator . . . discretionary authority, '[t]rust principles make a deferential standard of review appropriate'" and a denial of benefits is reviewed "under an 'arbitrary and capricious' standard." *Id.* (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989), and *Orvosh v. Program of Grp. Ins. for Salaried Emps. of Volkswagen of Am., Inc.*, 222 F.3d 123, 129 (3d Cir. 2000)).[14] "The scope of this review is narrow, and 'the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits.'" *Doroshow v. Hartford Life & Acc. Ins. Co.*, 574 F.3d 230, 234 (3d Cir. 2009) (quoting *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993)); *see also Cato v. Unum Life Ins. Co. of Am.*, Civ. No. 21-10056, 2022 WL 3013085, at *8 (D.N.J. July 29, 2022) ("Accordingly, deference should be given to the lion's share of ERISA claims." (citation omitted)). "[P]laintiff carries the burden of demonstrating that . . . the administrator's decision was arbitrary and capricious." *Menes v. Chubb & Son*, 101 F. Supp. 3d 427, 434 (D.N.J. 2015) (citation omitted).

That said, a court must look at a variety of factors when analyzing whether an ERISA decision was arbitrary and capricious, including procedural concerns about the decision-making process and structural concerns about conflicts of interest, and the factors ordinarily will vary and are "case-specific." *Est. of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 526 (3d Cir. 2009)

---

[13]    Plaintiff does not contest that the Plans gave Defendants discretionary authority and the exercise of that authority is "reviewed under the arbitrary and capricious standard." (ECF No. 39-4 at 8.)

[14]    Although the arbitrary-and-capricious standard applied in such instances is also referred to as an "abuse of discretion" standard, the United States Court of Appeals for the Third Circuit has underscored "that '[i]n the ERISA context, the arbitrary and capricious and abuse of discretion standards of review are essentially identical.'" *Fleisher*, 679 F.3d at 121 n. 2 (quoting *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 n.2 (3d Cir. 2011)); *accord Noga v. Fulton Fin. Corp. Emp. Benefit Plan*, 19 F.4th 264, 276 (3d Cir. 2021) (noting that the arbitrary and capricious and abuse of discretion standards of review are essentially identical in the ERISA context).

("[T]he factors to be considered will be varied and case-specific."   (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008))).

Ultimately, "[a]n administrator's decision is arbitrary and capricious 'if it is without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Fleisher*, 679 F.3d at 121 (quoting *Miller*, 632 F.3d at 844).  Substantial evidence is "defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Soubik v. Dir., Off. of Workers' Comp. Programs*, 366 F.3d 226, 233 (3d Cir. 2004)); *accord Richardson v. Perales*, 402 U.S. 389, 401 (1971) ("[S]upported by substantial evidence . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938))).  And "[w]hen reviewing an administrator's factual determinations, [courts] consider only the 'evidence that was before the administrator when he made the decision being reviewed.'" *Fleisher*, 679 F.3d at 121 (quoting *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir. 1997)); *see also Noga*, 19 F.4th at 275 ("But an ERISA administrative record may not be supplemented with *post hoc* explanations for procedural irregularities.").

III.   **DISCUSSION**

    A.   **Whether Plan Administrator's Rate of Reimbursement Determination Was Arbitrary and Capricious**

The parties' cross-motions for summary judgment raise a relatively narrow issue of whether the Plan administrator acted arbitrarily and capriciously in partially denying benefits payments for certain services provided by Plaintiff between July 1, 2018, through September 27, 2019, for which CMS did not have then-published rates (*see* CPT codes H0031, H0032, H2019,

H2012, and H2014).[15]  And, if so, what the appropriate reimbursement rate would be for these services under the circumstances.

It is undisputed that the 2018 and 2019 Plan documents both permitted the Plan administrator to utilize a gap methodology for determining the usual-and-customary rate of reimbursement for out-of-network services when CMS does not have rates published for certain procedural codes.  (SMF & RSMF ¶¶ 7-8; ECF No. 35-3 at 135, 263.)  The issue, however, is that nothing in the initial or amended appeals determinations to Plaintiff from UMR or in the administrative record generally, which is what this Court must review, actually states that a gap methodology was in fact utilized to determine the reimbursement rates.  The November 27, 2019 response was silent in this regard, and the December 23, 2021 amended determination (provided a year after Plaintiff filed suit and more than two years after the initial determination) states that a gap methodology "may be utilized."  (*See* ECF No. 35-3 at 293.)

Defendants appear to be asking this Court to accept the assertion made in this litigation (and not the administrative record) that the rates determined for the challenged services were appropriate because they were based on a "gap methodology."  Indeed, in their statement of material facts and memorandum of law in support of summary judgment, Defendants claim that the reason the reimbursement rate for Plaintiff's services changed in July 2018 from at least fifty

---

[15]    The parties appear to agree that for CPT code 97350, for which a CMS rate was published, the appropriate reimbursement rate was 140% of the CMS rate under the 2018 Plan and 110% of the CMS rate under the 2019 Plan.  (*See* ECF No. 35-1 at 15; ECF No. 39-4 at 11; SMF & RSMF ¶¶ 7-8, 21.)

There also appears to be a dispute as to whether the 2019 Plan amendments properly eliminated out of network coverage for ABA services, but the parties submit that this issue is not raised and does not need to be decided by the current motion practice.  (*See* RSMF ¶¶ 22-23 ("[T]he validity of the so-called revision is not at issue in this limited motion."); ECF No. 35-1 at 9 n.2 ("Given the limited scope of this motion for summary judgment, Defendants do not address Plaintiff's Mental Health Parity and Addiction Equity Act . . . claims . . . .").)

percent of billed charges to the lower rate currently challenged is that, "in or around July 2018, a gap methodology became available."  (SMF & RSMF ¶¶ 16, 20; ECF No. 35-1 at 15.)  In support of the allegation that a gap methodology became available in July 2018, Defendants cite nothing that actually confirms that assertion (and nothing that the Court could reasonably rely on in deciding these motions).  (*Id.*)  To the contrary, Defendants cite solely to the 2018 Plan document and the December 23, 2021 amended determination, both of which again merely state that "[a] gap methodology may be utilized" but neither of which says it *was* utilized, or that a methodology for the CPT codes in question became available in July 2018, or what a "gap methodology" meant under the circumstances.  (*See* ECF No. 35-3 at 135, 293.)

Based on such a record (or absence of a record), the Court is at a loss for how it could hold via summary judgment that Defendants' rate determinations were reasonable and not arbitrary and capricious.  *See Fleisher*, 679 F.3d at 121 (quoting *Soubik*, 366 F.3d at 233) (Substantial evidence is "defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."); *Conkright v. Frommert*, 559 U.S. 506, 521 (2010) ("Applying a deferential standard of review does not mean that the plan administrator will prevail on the merits.  It means only that the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'"  (quoting *Firestone*, 489 U.S. at 111)).

In similar cases where the administrative record was devoid of an adequate explanation for how the reimbursement rate was determined by the plan administrator, courts have been unwilling to grant summary judgment to the plan even when a potentially meritorious explanation was offered during the subsequent litigation.[16]  *See, e.g., Woodlands Outpatient Surgical Ctr. v. Am.*

---

[16]     This case is unlike those cited by Defendants where the reimbursement rate was obvious based on the clear language of a plan.  *See, e.g., Univ. Spine Ctr. v. Horizon Blue Cross Blue Shield of New Jersey*, Civ. No. 16-8021, 2018 WL 1169126, at *3 (D.N.J. Mar. 6, 2018) ("[T]he SPD

*Bureau of Shipping, Inc. Emp. Benefit Plan*, Civ. No. 17-1476, 2020 WL 6365533, at *9 (S.D.

Tex. Aug. 20, 2020), *report and recommendation adopted sub nom.*, Civ. No. 17-1476, 2020 WL

6373269 (S.D. Tex. Sept. 29, 2020) ("[T]he contents of the administrative record, standing alone,

would be insufficient for the Court to determine, under either *de novo* or an abuse of discretion

standard of review, whether the reimbursement amount was consistent with the terms of the plan

and the 2014 SPD. . . . [B]ecause the administrative record does not . . . support the benefits

decision at issue, ABS Plan is not entitled to summary judgment on [the] § 1132 claim for

benefits.").

    Especially under the specific facts of this case, summary judgment for the Plan as to the

reimbursement rates challenged is not possible based on the actual administrative record.  The

administrator's initial determination in November 2019 did not expressly mention the use of a gap

methodology and, instead, stated that "[t]he plan allowance is 140% of the Medicare allowance"

(even though there were no CMS rates published for the CPT codes at issue) and proceeded to

provide a breakdown of the dates of service, CPT code, billed amount, and reimbursement amount

without any further explication.  (ECF No. 35-3 at 316.)  Then two years later, after Plaintiff

brough suit, the administrator amended the determination in December 2021 to solely say that a

gap methodology "may" be used, not that it *was* used.  (*Id.* at 293.)  This change in reasoning raises

legitimate questions for the Court (including as to the long delay in amending the initial

determination) and supports the inference that both the process of reaching the determination and

---

explicitly provides that 'in the case of Out-of-Network Providers,' the authorized Allowance is
'determined as 250% of the amount that would be reimbursed for the service or supply under
Medicare.'  The language of the Plan could not be more clear.  Plaintiff has no right to expect to
be reimbursed more than the Medicare rates allow. . . .  As nothing in the record suggests that the
underlying claims were improperly processed under the Plan, Plaintiff's entire suit rests on its
dissatisfaction with the amount it was reimbursed.").

its substance were arbitrary and capricious.[17] *See Miller*, 632 F.3d at 845 ("[I]n considering the process that the administrator used in denying benefits, we have considered numerous 'irregularities' to determine 'whether, in this claimant's case, the administrator has given the court reason to doubt its fiduciary neutrality.'" (quoting *Post v. Hartford Ins. Co.*, 501 F.3d 154, 165 (3d Cir. 2007))).  Accordingly, Defendants' summary judgment motion must be denied.

Nevertheless, the Court likewise cannot grant summary judgment at this stage to Plaintiff as to its request that the rate of reimbursement for the services at issue be set at fifty percent of the amount billed.  Both the 2018 and 2019 Plan documents plainly state that where there are no CMS rates published for covered services, the administrator may utilize a "gap methodology" and that it is the administrator that retains the discretion to determine if the reimbursement rate should be fifty percent of the provider's billed charges "when unable to obtain a rate published by CMS and/or gap methodology does not apply."  (ECF No. 35-3 at 135, 263; SMF & RSMF ¶¶ 7-8.)

In view of this discretion vested in the Plan administrator and the basis of the administrator's prior rate determinations being insufficient for the Court to find that it acted reasonably, the Court believes that the appropriate remedy is not to unilaterally impose what the Court views as an appropriate reimbursement rate but to remand to the Plan administrator so that the administrator can clarify – and, if necessary, revise – its prior determinations so that the parties

---

[17]    Although not raised by Plaintiff, the Court also questions whether there is a conflict of interest inherent in Ocean Healthcare both paying and deciding what should be paid.  Ultimately, this is but one non-dispositive factor to be considered, and the Court finds that it weighs slightly, if at all, in Plaintiff's favor. *See Fleisher*, 679 F.3d at 122 n.3 ("[T]he conflict of interest inherent in the fact that Standard both pays and decides what should be paid is a factor to be considered in applying the abuse of discretion standard of review.  It is not, however, inherently a determinative factor.  Indeed, 'the existence of a conflict,' such as the one in this case, '[does] not change the standard of review from abuse of discretion to a more searching review.'" (quoting *Glenn*, 554 U.S. at 113, and *Doroshow*, 574 F.3d at 234); *Noga*, 19 F.4th at 276 ("that conflict must be weighed as [one] factor" (quoting *Firestone*, 489 U.S. at 115)).

and the Court can benefit from a full and fair review.  *See, e.g., Miller*, 632 F.3d at 856-57; *Levine v. Life Ins. Co. of N. Am.*, 182 F. Supp. 3d 250, 266 (E.D. Pa. 2016) ("In an ERISA benefits case, a court has discretion in fashioning a remedy.  Upon finding that a plan administrator has not reached a correct decision . . . , a court may . . . remand . . . ."  (citations omitted)); *see also Card v. Principal Life Ins. Co.*, 17 F.4th 620, 624-25 (6th Cir. 2021) ("Often times, though, a court will find an . . . administrator's reasoning cannot stand.  When an administrator makes this kind of process error, we have held that a court should 'remand' the beneficiary's claims to the plan administrator for a second benefits determination."  (citations omitted)).

Thus, the Court will remand to the Plan administrator and direct that within forty-five (45) days it issue a clarifying determination to Plaintiff explaining the basis for the reimbursement rates and amounts calculated for covered services provided to patient Y. between July 1, 2018, through September 27, 2019, during which time CMS did not have published rates (*see* CPT codes H0031, H0032, H2019, H2012, and H2014).

The Court will retain jurisdiction so that after the administrator issues its clarifying determination the parties may, if they choose, renew their motions.  *See Card*, 17 F.4th at 625 ("A district court that orders such an ERISA remand to a plan administrator . . . retains jurisdiction over the case while the administrator reassesses its benefits decision.  As a result, if an administrator denies the claim for a second time, the beneficiary need only file a motion seeking renewed relief in the still-pending federal suit."  (citations omitted)).

## IV.   **CONCLUSION**

For the foregoing reasons, and other good cause shown, Defendants' Motion for Summary Judgment (*see* ECF No. 35) is **DENIED**, and Plaintiff's Cross-Motion for Summary Judgment (*see* ECF No. 39) is **DENIED**.  An appropriate Order follows.

Dated: April 28, 2023

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE